IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| NESTOR A. BAEZ, | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : |
| | : |
| | : |
| CAROLYN W. COLVIN, | : |
| **Acting Commissioner,** | : |
| **Social Security Administration,** | : |
| | : |
| **Defendant.** | : |

Action No. 2:14-cv-00628

## REPORT AND RECOMMENDATION

Plaintiff Nestor A. Baez ("Mr. Baez") filed a complaint, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), that seeks judicial review of the final decision of the Defendant, the Acting Commissioner of the Social Security Administration ("Acting Commissioner"), which denied Mr. Baez's claim for Disability Insurance Benefits ("DIB") pursuant to Title II, and his claim for Supplemental Social Security Income ("SSI") pursuant to Title XVI, of the Social Security Act. Both parties have filed motions for summary judgment, ECF Nos. 11 and 13, with briefs in support, ECF Nos. 12 and 14, which are now ready for recommended resolution.

This action was referred to the undersigned United States Magistrate Judge ("the undersigned") pursuant to 28 U.S.C. §§ 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b), Local Civil Rule 72, and the April 2, 2002 Standing Order on Assignment of Certain Matters to United States Magistrate Judges. For the following reasons, the undersigned **RECOMMENDS**

the Defendant's Motion for Summary Judgment, ECF No. 13, be **DENIED**, Mr. Baez's Motion

for Summary Judgment, ECF No. 11, be **GRANTED** to the extent it seeks reversal and remand

of the Commissioner's decision, and **DENIED** to the extent that it seeks entry of an order

directing the award of benefits, and the Commissioner's decision be **VACATED** and

**REMANDED**

## I. PROCEDURAL BACKGROUND

Mr. Baez filed an application for a period of disability and disability insurance benefits

on November 25, 2013, originally alleging a disability onset date of October 13, 2011.[1] R. 73.

This application was initially denied on April 4, 2014, R. 86, R. 107, and denied again upon

reconsideration on April 30, 2014, R. 106. Mr. Baez requested a hearing in front of an

Administrative Law Judge ("ALJ"), R. 116, which was held on August 20, 2014. R. 45. The

ALJ issued his decision on September 4, 2014, denying Mr. Baez's application. R. 25. The

Appeals Council for the Office of Disability and Adjudication ("Appeals Council") denied Mr.

Baez's request for review of the ALJ's decision on October 24, 2014. R. 1-3. After exhausting

his administrative remedies, Mr. Baez filed his complaint for judicial review of the Acting

Commissioner's final decision on December 9, 2014. ECF No. 1. The Acting Commissioner

filed an answer on February 23, 2015. ECF No. 3. Both parties filed motions for summary

judgment, ECF Nos. 11 and 13, and the matter is now ripe for recommended adjudication.

---

[1] "R." refers to the certified administrative record that was filed under seal on February 23, 2015, ECF No. 9, pursuant to Local Civil Rules 5(B) and 7(C)(1).

## II. RELEVANT FACTUAL BACKGROUND

In his application, filed November 25, 2013, Mr. Baez alleged a disability onset date of October 13, 2011. R. 132-134. At the time of the ALJ's decision, Mr. Baez was a thirty-year-old man with a high school education who served in the Marine Corps from May 9, 2005 until September 29, 2013. R. 23, 24, 154-157. At the hearing held on August 20, 2014, Mr. Baez supplemented his medical records by providing additional information via testimony. The record included the following factual background for the ALJ to review:

Mr. Baez resides in Norfolk, Virginia with his wife and his one-year-old child. R. 50. His wife no longer works but serves as Mr. Baez's caregiver. R. 50. Mr. Baez arrived to the hearing with a cane that he began using in March of 2014 and stated that he got the cane because "when they did tests for my movements of my ankles and all that they found out I should not be walking because I was making more pressure on my ankles. I have tendonitis in both of my ankles." R. 51. He also noted that he used crutches before March but they were taken away when he was active duty. *Id.*

Mr. Baez was put on limited duty until he retired and received a 100 percent disability rating from the VA. R. 52. When asked what his tasks on limited duty were, he stated, "Nothing. Just nothing. I couldn't do anything. They just having me sitting down most of the time." R. 53. He was essentially working as a security monitor at a military base and watched monitors to make sure others were doing their job and that no unauthorized personnel entered the base. R. 53-55. He worked three days a week. R. 54. He also indicated that if something happened, he would have to "call over the phone" and "fill out reports." R. 55. Additionally, he

3

supervised two other security personnel as they walked throughout the building and completed inspections. *Id.*

When he left the Marine Corps in 2013, he continued to look for security jobs. R. 56. In fact, he worked for two days at one job but ended up unable to complete the required tasks because of the walking, camera monitoring, and concentrating required. *Id.* He also stated that he takes medications for depression but could not remember the specific names until his attorney refreshed his memory. R. 56, 64-65. He stated that he takes medications for both his mood and migraines but that he experiences "fighting" symptoms with some medication. R. 57. For example, he stated he has road rage and is easily irritated. R. 57-58.

Mr. Baez injured his collarbones and shoulder by hitting the steering wheel in a car accident: "I have tendonitis in my shoulder, biceps and triceps." R. 60. Due to this, Mr. Baez indicated that he cannot lift more than five pounds. *Id.* He also started physical therapy but stopped "because it was not working." *Id.* During the hearing he also mentioned he had problems sitting and asked to stand up for a moment. *Id.* He stated that he can only sit for about fifteen minutes at a time and that he can only stand for about fifteen or twenty minutes at a time. R. 61. He also can only walk about 200 meters before he needs to stop due to pain in his ankles. *Id.* He can no longer complete a security job looking at monitors because "every time that [he tries] to concentrate, [he] can't because [his] anger problems come back, and [he has] to have [his] ankles raised above . . . the seat." *Id.* Mr. Baez noted that he has tendinopathy of the right shoulder and limited range of motion in both shoulders as well as ankle enthesopathy. R. 61-63.

In addition to physical ailments, Mr. Baez testified that he tried to kill himself at some point and was admitted to the Portsmouth Naval Center for treatment. R. 64-66. He stated that

because of memories from Iraq, he sometimes gets tearful and thinks that people are going to hurt him. R. 64. He indicated that these feelings may have been a side effect of some of his medication. R. 65. At the time of the hearing, he was taking Zoloft for anxiety and depression, as well as Prazosin for nightmares. R. 64-65.

Mr. Baez's medical records reveal a copious history with the Hampton VA Medical Center ("Hampton VAMC") and the Naval Medical Center-Portsmouth ("NMCP"). Mr. Baez's alleged onset date, October 13, 2011, stems from the results of a car accident in which he was rear-ended and hit the steering wheel with his chest/shoulder. R. 808. However, prior to this date, Mr. Baez has an extensive record of complaints and alleged symptoms starting back in 2010. On March 5, 2010, he complained of cold symptoms. R. 892. On April 6, 2010 he sought treatment for stomach pain, nausea, and vomiting. R. 889. On May 26, 2010 he reported "new symptoms" but did not experience pain or emotional stress. R. 887-88. On June 14, 2010, Mr. Baez complained of pain in his tonsils, lower back, and neck. R. 884. On June 15, 2010, he had another appointment for possible strep throat. R. 881. On June 16, 2010 he had an appointment for pharyngitis. R. 880. On September 23, 2010 he saw a doctor for a "Tdap" vaccine, a sore throat, and a cough. R. 874-77. On September 27, 2010 he complained of tonsillitis. R. 871. On October 23, 2010, he went to the NMCP Ortorhinolaryngology center for issues of "recurrent tonsillitis, sleep issues." R. 868. On November 1, 2010, he sought help at the NMCP Pulmonary Sleep Clinic for snoring problems. R. 865. On November 4, 2010 he sought treatment for complaints of a swollen left elbow. R. 862.

Also prior to his alleged onset date, on November 29, 2010, records indicate that Mr. Baez did a sleep study that showed "good sleep efficiency at 95%." R. 985, 856-59. However, it

5

appears he was diagnosed with mild sleep apnea. R. 985. A NMCP operation report reveals that Mr. Baez's tonsils were removed due to "[m]ild obstructive sleep apnea with significant socially disruptive snoring." R. 982. On January 3, 2011, he had an appointment for stomach pains and a fever. R. 853. On January 4, 2011 he again went to the NMCP Ortorhinolaryngology for sleeping issues. R. 850. One day later, he went back to the NMCP Family Medicine center for a stomach pain follow-up. R. 846. On January 10, 2011 he went back for "pain and swelling to the left index finger." R. 844. On January 13, 2011 he went in for a "swollen left hand." R. 841. On February 1, 2011, he went back to the doctor to discuss surgical options for snoring. R. 838-39. On April 22, 2011, he complained of neck pain/neck strain in his right side. R. 835.

On April 25, 2011, Mr. Baez went to the NMCP Mental Health Adult center for "anger issues." R. 829, 966. Mr. Baez stated that he "just want[ed] to know if [he has] mental problems." R. 967. Mr. Baez described his mood as explosive, triggered by interpersonal and occupational stressors but was unable to articulate any particulars. R. 830, 967. He also reported problems sleeping, low energy, and low concentration, but denied nightmares, flashbacks, physiological distress, depression, manic or psychotic symptoms, anxiety, panic attacks, suicidal ideation, and hallucinations. *Id.* A Mental Status Examination concluded that Mr. Baez was alert and oriented, as well as pleasant and cooperative. R. 830, 969. Further, he was found to not have a diagnosis for PTSD because he had a lifetime of behavioral issues dating priort to enlistment, including irritability and anger. R. 831, 969. The doctor also stated that his low energy and concentration are likely a result of lack of sleep and his poor eating habits that include a substantial amount of caffeine. *Id.*

6

The record indicates Mr. Baez had six appointments and/or medical visits between April 26, 2011 and October 14, 2011. His October 14, 2011 appointment was for the car accident previously mentioned that triggered his disability and characterizes his onset date. R. 808. At this time he was twenty-seven years old. R.809. X-rays of his neck and a cat scan of his head were normal, but he showed signs of pain and stiffness in his shoulder. R. 809. At his follow-up a few days later, the doctor indicated Mr. Baez had a sprained left shoulder but no limb swelling. R. 806. In a second follow-up on October 19, 2011, he indicated that he had a headache and vomiting in addition to his shoulder and neck pain. R. 802-03. On November 9, 2011, Mr. Baez went back to the NMCP Otorhinolaryngology center to request another sleep study. R. 794. Starting December 13, 2011, Mr. Baez attended physical therapy at the NMCP Physical Therapy Oceana center for neck strain and a shoulder sprain. R. 792. He reported having collar bone pain that worsened while lying down, lifting, and wearing a seatbelt. *Id.* Three days later, he followed up for another physical therapy appointment and reported feeling better after treatment but still felt tight in his chest area. R. 791. He was prescribed to stretch daily and use ice if needed. *Id.* On December 21, 2011, he reported for a physical therapy massage and stated that "treatment seems to be helping but [he was] very sore last night." R. 790.

A Boice Sleep Laboratory study on December 28, 2011 indicated a diagnosis of "Primary Snoring" with treatment options to include "modification of the risk factors, including obesity and alcohol ingestion[,] use of external nasal strips, and body positioning." R. 787. In an appointment on January 6, 2012, Mr. Baez reported no improvement with physical therapy and was temporarily discharged from treatment. R. 785. He did, however, indicate he felt dizzy and had a bad headache and it appears his blood pressure was slightly elevated at 132/90. *Id.* He

7

followed up three days later for his blood pressure concerns. R. 782. He reported "frequent headaches and is concerned that its due to his blood pressure." R. 783. During a "serial blood pressure check" his blood pressure remained between 118/68 and 132/88. R. 780. On February 22, 2012, Mr. Baez got an MRI regarding joint pain in his shoulder. R. 769. Result impressions include "supraspinatus and infraspinatus tendinopathy with a minimal tear of the supraspinatus . . . [and] tendinopathy of the long head of the biceps tendon" in both the right and left shoulders. R. 771. However, there also were no fractures, effusions, or dislocations, and joint space and alignment appeared normal/anatomical. R. 771-72. On March 20, 2012, Mr. Baez received an injection to reduce pain in his shoulders. R. 755. On May 9, 2012, he reported no improvement from the injection and questioned the doctor as to why he needed to continue physical therapy because he felt like it made his condition worse. R. 753. At the session he attempted to use a theraband to stretch and work on his strength/resistance, but was only able to do two repetitions. *Id.* A report on May 16, 2012 indicates Mr. Baez was on two anti-inflammatory medications, Naproxen and Meloxicam, and one muscle relaxer, Diazepam. R. 743. Between June 7, 2012 and September 26, 2012, Mr. Baez had about six different appointments with specialists for a variety of issues such as allergies and pain in his bilateral clavicle. R. 727-42.

On October 15, 2012, Mr. Baez went to the NMCP for a psychiatric evaluation. R. 945. He indicated that he had nightmares, was paranoid, argued a lot with his wife, and "feels like he is back in Iraq at times." *Id.* His wife reported that he does not engage in conversation much and sometimes talks to himself around the house. *Id.* The examination revealed that he had no prior history of psychiatric disorders but meets the criteria for PTSD with combat trauma, nightmares, avoidance of thoughts and activities, detachment, irritability, outbursts, and poor

8

concentration with marital difficulties. R. 947. An October 17, 2012 report for Mr. Baez's Back On Track ("BOT") for Combat Stress evaluation—a voluntary program to help veterans struggling with combat trauma to return to full duty—states that Mr. Baez was on the following medications: Remeron, Tramadol, Percocette, and Celebrex. R. 935-36. It also stated that he was "not actively psychotic, does not have severe traumatic brain injury, [and] is able to maintain good basic self care [sic]." R. 936. The report concluded he was appropriate for BOT. *Id.*

At an appointment on October 24, 2012, Mr. Baez's medication changed and he was only listed as taking Prozac and Tramadol, in addition to allergy medications. R. 718. On November 2, 2012, Mr. Baez went to the NMCP Pulmonary Sleep Clinic to address his possible sleep disorder. R. 716. Dr. William Highlander ("Dr. Highlander") discussed the results of Mr. Baez's past sleep studies with him, noting that the first study revealed overt sleep apnea but the second study, in December of 2011, was normal. R. 717. Dr. Highlander decided that a "Titration Study" would be necessary to assess the fact that Mr. Baez appears to have "difficulty maintaining sleep." *Id.* He also instructed Mr. Baez to avoid excessive caffeine, especially prior to bed time, and to abide by regular sleeping hours

On November 8, 2012, Mr. Baez returned to the NMCP Sports Medicine Clinic, complaining of pain in his collarbones, shoulders, and back. R. 709. Physician Craig Bischoff prescribed Celebrex and discontinued Mr. Baez's past pain medication. *Id.*

On November 26, 2012, Mr. Baez followed up with the NMCP Psychiatric center for a mental health evaluation. R. 706. In addition to his past complaints of sleep problems/nightmares, paranoia, feelings of guilt and anger, and lack of energy, Mr. Baez

reported worsening symptoms, increased irritability, increased hyperactivity or difficulty staying still, decreased tolerance for frustration, and increased anxiety. R. 703. His overall mood is "mad." *Id.* His wife noted that in his sleep "she sometimes hears him talking to her or to the fetus. She states that it is positive speech." *Id.* Mr. Baez responded that he does not have auditory or visual hallucinations but that "while he is talking to himself, he feels like he is talking to someone else." *Id.* His current medications included Meloxicam, Celebrex, nasal spray, and hydrocodone. *Id.* Dr. Robyn Treadwell ("Dr. Treadwell") indicated that though he was "stiffly" sitting, he was "cooperative with the interview and ma[de] good eye contact. . . . He [was] alert and oriented. . . . Thought [was] coherent, logical and goal-directed." R. 704. She also discussed PTSD treatment options with Mr. Baez and stated that he was mentally competent to take part in treatment planning and agreed to start him on Mirtazapine for his mood, while discontinuing Prozac. *Id.* She encouraged him to make a specific list of goals for his relationship and fatherhood worries as well as to cope by breathing deeply and to work on muscle relaxation. *Id.* She also encouraged family therapy, which both Mr. Baez and his wife agreed to try (noting that they tried it in 2011 as well). R. 703-04. Dr. Treadwell also set up a safety plan for him, whereby "should he have thoughts of harm to self/others – to contact wife, therapist/psychiatrist, Military One Source, the clinic, go to the ED or call 911." *Id.*

Two days later, Mr. Baez went back to the NMCP Pulmonary Sleep Lab for an overnight polysomnogram titration study where his sleep would be monitored. R. 699. A CPAP machine was used for the study. *Id.* The titration study "demonstrated an improvement in sleep from the baseline study. A CPAP pressure of 10 centimeters of water pressure was effective and recommended to be prescribed with the face mask." R. 700.

Mr. Baez did not show up for an appointment at the NMCP Mental Health Adult center on December 10, 2012. R. 696. When consulted about his missed appointment, Mr. Baez stated that he did not know about the appointment and that "he is 'great.'" *Id.*

On December 12, 2012, Mr. Baez had his third psychiatric evaluation at NMCP. R. 690. This evaluation was for the Trauma and Operational Stress Services Clinic ("TAOSS") and consisted of a ninety minute evaluation with a review of Mr. Baez's medical records, a complete clinical interview, mental status examination, a report with diagnostic impressions, and treatment recommendations. *Id.* During the interview, Mr. Baez stated that in his second deployment (in Kuwait), he saw a lot of dead bodies while on a humanitarian mission and was instructed to "clean up" some of them, "which was somewhat disturbing to him." R. 691. He mentioned that this was his first experience with close-up death. *Id.* In 2009, he deployed to Al-Assad, Iraq, where he was involved with daily patrols and saw many mortar attacks but no actual combat. *Id.* He said he saw an Iraqi man get shot dead and also watched an Iraqi convoy hit an IED about 300 meters in front of him. *Id.* He felt a shockwave and spent about twenty minutes in shock, unable to respond, even on the radio. *Id.* He stated that he "felt a large amount of hopelessness" and decided he was "done and that he needed to go home." *Id.* In addition, "[h]e finds himself having flashbacks at times, where he suddenly feels like he is back in Iraq as well as very vivid and intrusive memories and nightmares about events." *Id.* Certain things will trigger these flashbacks, including being around a Humvee or firing his own weapon. *Id.* "He feels like he is constantly on guard, watching behind him, and has even turned to yell at people that were too close to him while walking or things like that." *Id.* He also mentioned that joining the Marine Corps was probably a bad idea and that he is at a point where he is ready to get out. *Id.* During

11

the behavioral observational/mental status exam, Mr. Baez "related appropriately to [the] interviewer with good eye contact.  His demeanor was calm and friendly; he readily answered questions and volunteered information. . . .  His thought processes were logical and coherent. His thought content did not reveal the presence of any obvious delusions or paranoia." R. 692.

In his impression, Dr. Joshua Paul, M.D. ("Dr. Paul") stated that "he does meet the criteria for PTSD with the trauma, re-experiencing, avoidance, and hyperarousal symptoms as well as significant dysfunction.  He also seems to be having some depressive symptoms co-morbidly, as well." *Id.*  Dr. Paul then recommended a treatment plan that stated Mr. Baez was psychiatrically fit for full duty. . . .  He is responsible for all of his actions and should be held fully accountable." R. 693.  In sum, Dr. Paul found that Mr. Baez should follow up with Dr. Treadwell, should continue to take the already-prescribed medications, and should attend the BOT therapy program. *Id.*

On December 17, 2012, Mr. Baez met with Dr. Suzanne Dundon, M.D. ("Dr. Dundon") for his BOT Initial Patient Contact. R. 682-83.  Dr. Dundon stated that Mr Baez "is not actively psychotic, does not have severe traumatic brain injury . . . and is able to maintain good basic self care [sic] and well controlled on all medications." R. 684.  She also mentioned that he declined to attend class but was encouraged to follow up with primary his primary mental health provider. *Id.*

Two days later, Mr. Baez reported to the NMCP Pain Management center complaining of bilateral shoulder pain. R. 675.  Dr. Michael Hillegass, M.D. ("Dr. Hillegass") did not find any evidence of tears, atrophy, or edema, nor did he find any evidence of fractures or abnormal bone marrow. R. 678.  However, he did appear to note that Mr. Baez did have abnormal motion and

his shoulders were both tender on palpation. R. 676. Dr. Hillegass referred him to the NMCP

psychology department for pain management. *Id.* That same day, Mr. Baez had an appointment

at the NMCP Gastroenterology center for his fatty liver. R. 672. His liver appeared slightly

enlarged but everything else appeared normal, including his heart rate and blood pressure. R.

671-73.

On January 24, 2013, Mr. Baez went to the NMCP Family Medicine Patient-Centered

Medical Home Team, where he awaited cardiology results. R. 649. He requested a referral to a

neurologist for migraines. *Id.* He mentioned he had a "[f]air general overall feeling;" However,

he also stated he was "[t]hinking about suicide." R. 650. His cardiology results came back

normal but he was diagnosed with a headache and referred to the NMCP Neurology center. R.

651.

On February 5, 2013, Mr. Baez returned to the NMCP Pulmonary Sleep Clinic to review

the results of his latest sleep study. R. 645. Dr. Highlander prescribed ResMed S9 and discussed

different options for breathing masks while sleeping. *Id.* Mr. Baez elected to try the CPAP

machine. *Id.*

The next day, Mr. Baez had a follow-up with Dr. Treadwell at the NMCP Mental Health

Adult clinic. R. 641. Mr. Baez reported that he was "frustrated at not being able to find a job for

May when he leaves the [Marine Corps]." R. 642. He worried about his new born baby on the

way and "is angry too much" but that his mood on the day of this appointment was "kinda good,

kinda not." *Id.* He stated that he had a dream about his father dying and he woke up crying,

which sparked an argument with his wife. *Id.* He also reported that for the last year he has

experienced daily migraines associated with increased sensitivity to light. *Id.* He told Dr.

13

Treadwell that he did not mention the migraines before because "he wanted to deal with it himself." *Id.* He reported the pain as a 10-out-of-10 in the shoulders and collar bone, although he was able to walk to the office without stopping and was able to converse. R. 643. In her assessment of him, Dr. Treadwell noted Mr. Baez's PTSD and complaints of depression and neurovegetative symptoms, but stated that he has "poor medication compliance." *Id.* She also stated, regarding the headaches he wanted to deal with on his own, "He also reports ongoing headaches and increased pain today that he has previously not disclosed which is odd as this was asked in earlier evaluations." *Id.*

On February 21, 2013, Mr. Baez went to the NMCP Neurology center for his headache pain. R. 639. He reported that his "headaches are preceded by blurred vision and generalized weakness 20 mins [sic] prior to the onset of the headaches. Stress, prolonged exposure to cold weather, bright lights, bright sunlight and computer screens are his only headache triggers. The headaches are associated with photo/phonophobia, dizziness, tinnitus, blurred vision, vertigo, loss of coordination, fatigue, tearing eyes, redness in both eyes and problems concentrating." *Id.* He also noted that he generally relieves his headaches with sleep. *Id.* Dr. Marion Keeling ("Dr. Keeling") prescribed Mr. Baez Maxalt, Elavil, and restarted him on Prozac with twelve days of Prednisone to break the current daily headache cycle. R. 640.

On February 25, 2013, Mr. Baez attended his first BOT group therapy session. R. 636. Dr. Dundon stated that Mr. Baez "was cooperative and alert" and had good participation in the group discussion. *Id.* "No psychomotor abnormalities or behavior peculiarities were noted." R. 633. The next day, Mr. Baez attended the BOT group therapy session regarding "radical acceptance." R. 626. The discussion involved negative emotional consequences of judging,

14

fighting, and getting angry. *Id.* Mr. Baez's mental status appeared to be organized, linear, and goal-directed, with good insight and judgment. *Id.* On February 27, 2013, Mr. Baez attended his third BOT group session. R. 616. The group discussed cognitive behavioral theory and automatic thoughts. R. 617. Once again, Mr. Baez was alert and cooperative and actively participated in group exercises and discussions. *Id.* On February 28, 2015, he attended a BOT program on managing anger. R. 603. Mr. Baez again "participated in group discussions and was able to grasp the educational components." R. 604. Mr. Baez attended a few more sessions throughout the end of February and early March, including modules on sleep, medication, conflict resolution, assertiveness, nutritional education, and goal therapy. R. 594, 581, 578, 567, 559, and 554 respectively. At each group session he was reported to be alert, cooperative, and fully oriented with no behavioral abnormalities noted, a logical and linear thought process, and no evidence of hallucinations, delusions, or bizarre thinking. *See id., et seq.* At an art therapy session, Mr. Baez "completed an image and showed motivation. R. 552. He was able to identify other stress relieving activities such as auto mechanics, but revealed anger problems when things [did not] work out as expected." *Id.* On March 5, 2013, Mr. Baez reported to the NMCP Occupational Therapy, Mental Health department. R. 572. He reported pain to be an 8-out-of-10 "but requested no assistance in addressing the pain." He appeared to be interested in learning about pet therapy and was interested in getting a snake, even though he already has a poodle and two pit bulls. R. 573. On March 8, 2013, Mr. Baez was discharged from the BOT program. R. 549. In her discharge summary, Dr. Dundan reported that Mr. Baez "observed to be alert and participative. At times, his input was off topic. Thinking was concrete. Although he complained of chronic fatigue, he was alert throughout the course. . . . Despite endorsing a high

level of anxiety-PTSD symptoms, he declined any follow-on treatments, other than seeing Dr. Treadwell." R. 551.

On April 4, 2013, Mr. Baez returned to the NMCP Neurology center regarding his headaches. R. 536. He reported having no change in the frequency or intensity of his headaches. R. 537. Dr. Keeling instructed him to continue taking Maxalt, but discontinued Elavil and had him start Topamax, in addition to twelve more days of Prednisone to break his current headache cycle. R. 538.

On April 11, 2013, Mr. Baez had a follow-up for his sleep apnea. R. 533. Dr. Highlander reviewed the results from Mr. Baez's CPAP device and found that he had been relatively compliant with usage and reported modest benefit in the form of improved sleep. R. 534.

On April 15, 2013, Mr. Baez had a follow-up with Dr. Treadwell. R. 529. He reported that he "continues to be irritable" and got in trouble for yelling at an officer. R. 530. He also indicated being "pissed off" with situations like parking or waiting on someone. *Id.* Though he reported a high level of anxiety (10-out-of-10), he indicated he was 5 percent better after doing the BOT program. *Id.* Dr. Treadwell indicated that Mr. Baez does not appear to have discussed his medications with his neurologist and has not been compliant with medicating either. R. 531. She instructed him that he should probably stop taking Prozac, Mirtazapine, and Amitriptyline. *Id.* He returned again on May 7, 2013 for a follow-up. R. 518. He reported feeling stressed, irritable, and constricted. R. 519. When asked about restarting his old medications, he indicated he was not interested and requested a referral to acupuncture for headaches and stress management. *Id.*

16

On May 20, 2013, Mr. Baez returned to see Dr. Keeling regarding his headaches. R. 507. Mr. Baez reported that the Maxalt he was prescribed was not effective. R. 508. He started having "difficulty sleeping tossing and turning nightly." *Id.* Dr. Keeling increased his Topamax dose and discontinued Maxalt, starting Imitrex instead and adding Pamelor for sleep. *Id.* The next day Mr. Baez saw Dr. Edwin Landaker ("Dr. Landaker") at the NMCP Neurology center for joint pain in his shoulder. R. 501. The medical records indicate the medication he was actively taking consisted of Sumatriptan Succinate, Nortriptyline, Topiramate (100 mg.), IB Profen, and Topiramate (25 mg.). R. 502. Mr. Baez reported that "[l]ifting heavy objects exacerbates pain as well [as e]xtending the arm at the shoulders hurts. Sleeping on his side makes it worse. . . . There is a tingling sensation across the top of the chest intermittently." R. 504. Dr. Landaker indicated that Mr. Baez even felt that sitting on the couch makes it hurt as well. *Id.* He was given a neurological examination that examined his nerves and motor skills. R. 505. Mr. Baez appeared weak in both ankles but improved with encouragement. *Id.* His legs were "ultimately full strength with normal tone and bulk throughout." *Id.*

On July 31, 2013, Mr. Baez met with Dr. Richard Kaye, D.O. ("Dr. Kaye") regarding his anxiety and PTSD issues. R. 491. At this time Mr. Baez was back on active duty after bring discharged from the Marine Corp on May 28, 2013, and then found to be only 20 percent disabled and returned to rebut the disability determination. R. 493. After reviewing Mr. Baez's medical history and reports from Dr. Treadwell, Dr. Kaye found that Mr. Baez is unfit for duty, has anxiety and PTSD, and reported that he had a GAF of 55. *Id.*

On August 5, 2013, Mr. Baez returned to see Dr. Keeling in the Neurology department. R. 488. He stated that the frequency and intensity of his headaches increased over the last

17

month. R. 489. Dr. Keeling discontinued Imitrex, adding Relpax, and continued Mr. Baez on Topamax and Pamelor. *Id.*

An August 27, 2013 report on radiographs of Mr. Baez's left hand that he indicated was painful for two weeks came back normal "without evidence of acute fracture or subluxation." R. 403. He also got an ultrasound of his abdomen, reporting pain in the right sight. R. 402. This came back normal with no signs of any issues. R. 402-03. A May 13, 2013 report indicated that images were also taken of his chest after he reported having a fever, chills, and a cough. R. 404. The chest report came back normal: "The lungs are clear. . . . The visualized upper abdomen demonstrates no pneumoperitoneum, bowel obstruction, or pathological calcification." *Id.*

On September 10, 2013, Mr. Baez met with Dr. Dundon again for a follow-up regarding his PTSD. R. 469. It is indicated in the "Patient Statement" of the medical report on this day that Mr. Baez made the appointment, stating his reason as, "I just want to talk!" R. 471. He reported that "he was very stressed out," mainly because his [VA] disability appeal was still pending and he felt there were errors in his paperwork. *Id.* At this time, he felt as if the military did not care about him and other service members. *Id.* He found himself to be more irritable, angry, betrayed, and let down. *Id.* He indicated that he had applied for some jobs but was unsuccessful and now worried about his job prospects. *Id.* His pain had increased, preventing him from picking up his child or walking his dog. *Id.* Dr. Dundon indicated that Mr. Baez simply wanted to talk and "vent" and that she offered "[s]upportive listening." *Id.*

On September 19, 2013, Mr. Baez met with Dr. Keeling again for a follow-up on his headaches. R. 466. He again reported daily headaches and no difference in his sleep patterns.

R. 467. Dr. Keeling instructed him to continue taking Topamax but discontinued Pamelor and Relpax, instead starting him on Trazadone and Zomig. *Id.*

On September 27, 2013, Mr. Baez went to the NMCP Family Medicine clinic for a follow-up regarding lab results showing elevated levels of his liver-function test. R. 454. He indicated that he had been having pain on the right side of his abdomen for the past week, with sharp pain after meals and bloating. *Id.*

On October 2, 2013, Mr. Baez had a follow-up at the NMCP Pulmonary Sleep Clinic. R. 440. Nurse Practitioner Thomas Achter reported that Mr. Baez stopped using his CPAP device for several months and then resumed it again about a month before this appointment. R. 443. Mr. Baez has apparently been feeling better with use of the CPAP. *Id.* He stated he was still a bit drowsier than he would like but a lot of that was likely related to having a newborn infant in the home. *Id.*

On November 4, 2013, a NMCP administrative member called Mr. Baez to see if he had scheduled his follow-up appointment with the Neurology center. R. 431. He indicated that "the medication helps his headache and he does not need a follow-up appointment at this time." *Id.* An ultrasound on February 28, 2014 indicated "Hepatomegaly and findings compatible with the known diagnosis of fatty liver." R. 215. On March 10, 2014, Mr. Baez obtained paperwork for a handicapped sticker, indicating he now walks with a cane and has a bad hip and tendonitis in both ankles. R. 416.

On April 29, 2014, Clinical Psychologist Leonard Holmes, Ph.D. ("Dr. Holmes") stated that "a large portion of Mr. Baez's testing appears invalid." R. 1052. For instance, when Dr. Holmes reviewed past records, he noted that when another doctor gave Mr. Baez the Babinski

19

test, which test reflexes by touching one's foot, he also asked Mr. Baez to tell him if his forehead hurt (the Babinski test has nothing to do with the forehead and is solely related to the feet). *Id.* Surprisingly, Mr. Baez responded that his forehead did hurt during the test. *Id.*

On April 30, 2014, Mr. Baez saw Orthopedic Surgeon Helmuth W. Trieshmann ("Dr. Trieshmann") at Hampton VAMC, Dr. Trieshmann indicated that Mr. Baez was "well appearing [and] . . . cooperative." R. 1051. His physical exam stated that Mr. Baez "ambulates slowly with cane [sic], [has] difficulty bending over to untie shoes, normal appearance both [sic] ankles." *Id.* However, x-rays of his ankles came back normal and Dr. Trieshmann prescribed ankle braces as a form of pain management." *Id.*

On June 12, 2014, Mr. Baez indicated that he was not having thoughts of harming himself and had no plans to harm others. R. 1048. In a progress report on June 23, 2014 at Hampton VAMC, Psychology Technician Irvin Renitha ("Mr. Renitha") indicated that Mr. Baez "sounded alert and cooperative. [His s]peech was fluent and goal-directed. Previous suicidality was discussed; however, no current suicidal or homicidal ideations were expressed during today's visit. Mood was appropriate. Insight and judgment were fair." R. 1035. Mr. Renitha stated that Mr. Baez's risk potential for suicidal behavior is low, and that he was not likely to inflict self-harm. R. 1036.

At the initial level of review on April 3, 2013, Dr. Paula Nuckols, M.D. ("Dr. Nuckols") completed a Disability Determination that concluded Mr. Baez was "questionable for return to work secondary to multiple medical problems. However, he may be able to perform in the light PDC but unsure what field would be appropriate for candidate." R. 76. Dr. Nuckols found Mr. Baez to be partially credible, indicating that his symptoms appeared to be disproportionate to the

severity and duration that would be expected. R. 79. Dr. Nuckols gave little weight to the VA's disability determination, finding that it was "not well-supported by medically acceptable clinical and laboratory diagnostic techniques." R. 79-80. Dr. Nuckols also found that Mr. Baez could likely sit or stand for a total of six hours each in an eight-hour work day. R. 80. The overall determination was a finding of not-disabled because his conditions were not severe enough to keep him from working.

On April 30, 2014, at the reconsideration level of review, Dr. William Rutherford, Jr., M.D. ("Dr. Rutherford") reviewed the evidence of record. R. 88-106. Dr. Rutherford found that Mr. Baez had severe impairments including major joint dysfunction, hypertension, sprains and strains, respiratory system disorders, and anxiety disorders, but not including migraines. R. 96. With regard to his credibility, Dr. Rutherford found that Mr. Baez's "limitations [were] consistent with symptoms of the alleged impairments, but not to the extent that they meet/equal listing level severity." R. 98. It was also stated that Mr. Baez was questionable to return to work secondary to multiple medical problems; however, he would likely be able to perform light work. R. 99. Again, Mr. Baez was found to be able to sit or stand for a total of six hours each in an eight-hour work day. R. 100. Again, he was found to be not-disabled. R. 106. Upon these reviews, the Social Security Administration notified Mr. Baez that his claim for DIB was not approved. R. 107, 113.

### III. THE ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

A sequential evaluation of a claimant's work and medical history is required in order to determine if the claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v.*

*Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). The ALJ conducts a five-step sequential analysis for the Acting Commissioner, and it is this process that the Court examines on judicial review to determine whether the correct legal standards were applied and whether the resulting final decision of the Acting Commissioner is supported by substantial evidence in the record. *Id.* The ALJ must determine if "(1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment." *Strong v. Astrue*, No. 8:10-cv-357-CMC-JDA, 2011 WL 2938084, at *3 (D.S.C. June 27, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (noting that substantial gainful activity is "work activity performed for pay or profit."); *Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962) (noting that there are four elements of proof to make a finding of whether a claimant is able to engage in substantial gainful activity). "An affirmative answer to question one, or negative answers to questions two or four, result in a determination of no disability. Affirmative answers to questions three or five establish disability." *Jackson v. Colvin*, No. 2:13cv357, 2014 WL 2859149, at *10 (E.D. Va. June 23, 2014) (citing 20 C.F.R. § 404.1520).

Under this five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law. First, in determining whether Mr. Baez engaged in substantial gainful activity ("SGA"), the ALJ considered Mr. Baez's former employment with the Marine Corps. R. 13. Mr. Baez was an active duty member of the military until retiring in September of 2013. *Id.*

22

The ALJ noted that though he continued to work after his alleged onset date of October 13, 2011, the military placed him on limited duty, performing a security monitor job three days a week. *Id.* The military paid him full-time and gave him more breaks than normal during this limited duty duration. *Id.* The ALJ found that "[c]onsidering his actual job duties and performance, this work activity was not SGA." *Id.*

Second, the ALJ found that Mr. Baez has the following severe impairments: bilateral ankle tendonitis, bilateral shoulder disorder, traumatic brain injury, mood disorder, and anxiety/PTSD. *Id.* The ALJ concluded the impairments "significantly limit [Mr. Baez's] ability to perform basic work activities and are consequently severe" under citing 20 C.F.R. §§ 404.1520(c). *Id.* Mr. Baez also presented other alleged impairments—obesity, hypertension, headaches, obstructive sleep apnea, fatty liver, back strain, and a right and left hip disorder—but found these impairments do not significantly limit Mr. Baez's ability to perform work. *Id.* The ALJ employed an extensive analysis before rejecting Mr. Baez's alleged impairments as not severe. First, with regard to hypertension, the ALJ noted that the state agency found that hypertension is "severe" and that the Department of Veteran Affairs ("VA") found that Mr. Baez had a ten percent service-connected disability rating for hypertension based on his history of diastolic pressure. *Id.* However, the ALJ found that these findings contradicted the medical evidence on the record: In January of 2012, Mr. Baez's blood pressure was normal and he did not need treatment; in May of 2013, a year later, he was only "pre-hypertensive;" in October of 2013, he denied any hypertension; and in January 2014, he had high blood pressure but soon stabilized once on medication. R. 14. Therefore, the ALJ gave little weight to the state agency finding and the VA disability rating since "the evidence clearly demonstrates that less than

substantial weight is warranted." *Id.*

Regarding Mr. Baez's claim for migraines that cause "prostrating attacks . . . once a month" as a severe impairment, the ALJ also found that claim was contradicted by the medical evidence in the record. *Id.* Mr. Baez has not gone through a consistent period of performance-inhibiting migraines. *Id.* From 2011 to 2012, Mr. Baez did not have any significant treatment for his headaches. *Id.* He only started seeking neurologic treatment in February of 2013. *Id.* In January 2014, a VA physician indicated that Mr. Baez had "prolonged attacks of migraine and non-migraine headache pain causing him to miss work or get sent home from work at times." *Id.* The VA did give Mr. Baez a 30 percent service-connected rating for migraines based on having "characteristic prostrating attacks occurring on average once a month." *Id.* However, according to the records, throughout the rest of 2014 he "remained stable . . . [with] no evidence of 'prostrating attacks' occurring very frequently or on average once a month." *Id.* The state agency found these migraines to be non-severe. *Id.* The ALJ agreed, giving greater weight to the State agency finding than the VA service-disability rating and the VA physician's statements in January of 2014 regarding Mr. Baez's prolonged attacks that affected his work performance. *Id.*

Mr. Baez also alleged he had a severe impairment of obstructive sleep apnea, which he was diagnosed with in 2010 and has had symptoms of daytime somnolence. *Id.* Due to the somnolence, he was "told to avoid potentially dangerous activities when sleepy or sleepiness could be reasonably anticipated." *Id.* The VA found that Mr. Baez has a fifty percent service-connected disability rating for sleep apnea and in January 2014, a VA physician indicated that it affected his work performance. *Id.* The State agency also found the impairment to be severe.

24

*Id.* However, the ALJ noted that the VA rating was only based on the fact that Mr. Baez used a breathing assistive device (a continuous positive air pressure device or a "CPAP") and the "VA physician did not specify the degree to which daytime somnolence impacted [Mr. Baez's] functional abilities." *Id.* Additionally, the ALJ noted that the VA physician, as well as a CPAP titration study, indicted improvement in Mr. Baez's condition with the CPAP. *Id.* The ALJ also noted that the original diagnosis was only for a "mild" condition and that in January of 2012 a study demonstrated Mr. Baez had only snoring and decreased sleep latency. R. 15. Further, Mr. Baez poorly complied with his CPAP device, admitting in October of 2013 that he stopped using it for several months even though he reported that he felt better when using the device. *Id.* His compliance went from 33 percent to 20 percent in January of 2014, using the device on average for only about one and one-half hours. *Id.* Consequently, the ALJ gave little weight to the VA's rating and the State agency determination "because it is contrary to the evidence and does not account for [Mr. Baez's] poor compliance with treatment." *Id.*

The ALJ also considered another alleged impairment of Mr. Baez's fatty liver. *Id.* The ALJ noted that Mr. Baez "has a history of elevated liver function tests with ultrasounds showing enlarged liver with steatosis." *Id.* However, his "abdominal examinations . . . have been mostly benign, with no palpable liver . . . [and] just intermittent of occasional pain at most." *Id.* He does not have cirrhosis, and per a January 2013 biopsy was only found to have mild necroinflammatory activity—not enough inflammation for a hepatitis diagnosis. *Id.* Therefore, the ALJ found there was no evidence of any significant symptoms or complications related to the fatty liver and no evidence it causeed any work-related limitations. *Id.*

Mr. Baez also alleged back strain and right and left hip disorders. *Id.* The ALJ noted that

the VA gave him a ten percent service-connected disability rating for lumbosacral or cervical strain. *Id.* However, medical evidence showed no disabling limitations from this or any hip disorder: Cervical and lumbar spine x-rays showed no significant signs of degenerative changes. *Id.* In August of 2012, Mr. Baez reported receiving limited treatment for his back and had no incapacitating episodes of pain. *Id.* He had fairly good back range of motion, no back spasms, and was able to pass a leg-raising test. *Id.* Though he showed some limited range of motion in his hips, he did not have swelling, crepitus, laxity, or tenderness. *Id.* Subsequent testing showed Mr. Baez appeared to maintain "good strength and range of motion in his lower extremities, as well as a stable gait, balance, and stance, even without an assistive device." *Id.* The ALJ then concluded that Mr. Baez's claims for back strain and hip disorders were not severe and gave little weight to the VA's rating because "it does not reflect [Mr. Baez's] longitudinal medical records which show good functioning of his back. *Id.*

Mr. Baez also alleged obesity as a significant impairment. *Id.* The ALJ found that there is no evidence Mr. Baez's body mass index, which remained between thirty and thirty-three, "caused significant complications or worsened his other impairments to the point that they are disabling." *Id.* Further, the ALJ found there was no evidence "the combination of [Mr. Baez's] obesity and his other impairments is severe." R. 15-16.

Third, the ALJ found that Mr. Baez did not have an impairment or combination of impairments that met or medically equaled on of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 16. Specifically, the ALJ also found that Mr. Baez's obesity was not "medically equivalent in severity to any listing impairment, . . . [did not] increase[] the severity of any of his impairments . . ., or that obesity in combination with his other impairments

26

medically equals a listed impairment." *Id.* The ALJ considered Mr. Baez's shoulder and ankle disorders under Listing 1.02 but found the impairments did not meet the listing because Mr. Baez was "able to ambulate effectively and perform fine and gross movements." *Id.* In August of 2012, Mr. Baez had normal gait with no use of an assistive device, except for ankle braces but showed no abnormal weight-bearing on his feet. *Id.* The ALJ noted, though, that in August of 2014, Mr. Beaz's doctors certified that he could not walk 200 feet without stopping to rest and needed assistance such as cane due to arthritic, neurological, or orthopedic conditions. *Id.* However, "[e]ven when he was issued a cane, he could walk stably without it." *Id.* As for his shoulder, the ALJ found that his muscle tone, sensation, reflexes, and coordination were in good shape, and that he had stable use of his hands, wrists, and elbows. *Id.* The ALJ noted that some reports stated that Mr. Baez was completely dependent on assistive devices but, a few months earlier, an assessment indicated he was using the bathroom and eating independently and required minimal help grooming, dressing, and mobilizing. *Id.* Therefore, the ALJ gave little weight to Mr. Baez's doctor's certification that he was physically limited. *Id.*

The ALJ then considered Mr. Baez's mental impairments, singly and in combination, under Listings 12.02, 12.04, and 12.06. *Id.* The ALJ found that regarding "paragraph B" of the criteria of the mental disorder listings, Mr. Baez had "no marked limitations and no 'repeated episodes of decompensation.'" *Id.* The ALJ noted that Mr. Baez's daily living functions— cleaning, cooking, bathing, driving, shopping—were only mildly limited. R. 17. At work, the Marine Corps placed Mr. Baez on limited duty. *Id.* However, the ALJ noted that Mr. Baez attended group counseling sessions in early 2013, went shopping at times, and continued to apply for work after being discharged from the military. *Id.* Further, the ALJ found that Mr. Baez's

claims that he needed a caregiver for most functions to be incredible based on the lack of mental health treatment in his history, the activities reported in his progress notes, the longitudinal mental status examinations, as well as the fact that he is the parent of a one-year-old child. *Id.*

As for social function, the ALJ found that Mr. Baez had only a moderate limitation characterized by complaints of irritability and anger. *Id.* The ALJ noted some minimal evidence of these anger episodes but, at the same time, observed Mr. Baez "has never been fired from a job, is not violent, has no significant legal problems, displays no significant behavioral abnormalities, and . . . is cooperative with low impulsity/fair impulse control and intact judgment." *Id.* Further, the ALJ found that he could communicate effectively and could follow directions; therefore his limitations did not rise to the level of impairment associated with a Listing. *Id.*

As for concentration, persistence, or pace, the ALJ found that Mr. Baez had a moderate limitation characterized by problems focusing, completing tasks, handling stress, and changes in routine. R. 18. The ALJ further noted that Mr. Baez had the ability to perform simple tasks and his medical records showed no significant deficits in his memory, thought process, or cognition. *Id.* Further, the ALJ noted that Mr. Baez had "not always been consistently compliant with treatment, raising questions as to the actual severity of his alleged [mental] limitations." *Id.* Lastly, the ALJ found Mr. Baez had no episodes of decompensation for an extended duration, and aside from a brief psychiatric hospitalization, his adaptive functioning was relatively stable. *Id.* Therefore, the ALJ found that Mr. Baez's impairments did not satisfy the "paragraph C" criteria in the Listing for mental disorders. *Id.*

Fourth, the ALJ found that Mr. Baez had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), provided the work only involved "occasional postural activity; occasional pushing, pulling, and reaching; only occasional contact with coworkers, supervisors, and/or the general public due to limitations in social functioning; and only simply, routine, repetitive tasks, due to limitations in concentration, persistence, or pace." *Id.* The ALJ did a credibility analysis, noting that although some evidence weighed in Mr. Baez's favor, overall the evidence of the claimed limitations were not well supported, and Mr. Baez remained "not fully credible as his course of treatment, medications, progress notes, physical examinations, and activities do not fully support his allegations." R. 19-20. Further, the ALJ noted that "[d]espite his 'high' service-connected disability rating for PTSD and 100 percent total disability rating, for example, the record as a whole clearly demonstrates that the rating should not be given substantial weight." R. 20. And though there is some indication of psychiatric treatment—though poorly indicated on the record—the ALJ found he was "psychiatrically fit for full duty." *Id.* The ALJ also found that Mr. Baez was not compliant with medications or therapy. *Id.* The ALJ concluded that after considering the evidence, Mr. Baez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Mr. Baez's] statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible, and he can perform a limited range of sedentary work." R. 23.

The ALJ determined that Mr. Baez was unable to perform his relevant past work as a radio operator with the Marine Corps as it was precluded by his RFC. *Id.* Regardless, the ALJ found that other jobs existed in significant numbers in the national economy that Mr.

29

Lucas could perform, and thus, he was not under disability during the relevant time period. *Id.* The ALJ also noted that Mr. Baez is considered a "younger individual," between the ages of 18 and 44 as defined by 20 C.F.R. § 404.1563(c). *Id.* Mr. Baez also has a high school education and is able to communicate in English. R. 24 (citing 20 C.F.R. § 404.1564). Lastly, the ALJ found that considering his age, education, work experience, and residual functional capacity, there are jobs such as addressing clerk, surveillance system monitor, and inspector of electronics that exist in significant numbers in the national economy that Mr. Baez could perform. *Id.* (citing 20 C.FR. §§ 404.1569, 404.1569(a)). Therefore, the ALJ determined that Mr. Baez was not under a disability from October 13, 2011, through September 4, 2014, the date of the ALJ's decision. R. 25.

## IV. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of the Acting Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

In determining whether the Acting Commissioner's decision is supported by substantial evidence, the Court does not "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th

30

Cir. 1996).  If "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for the decision falls on the [Commissioner] (or the [Commissioner's] delegate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  Accordingly, if the Acting Commissioner's denial of benefits is supported by substantial evidence and applies the correct legal standard, the Court must affirm the Commissioner's final decision. *Hays*, 907 F.2d at 1456.

## V. ANALYSIS

### A.  The ALJ's decision that Mr. Baez's sleep disorder and migraine headaches were not severe impairments is substantially supported by evidence in the record.

In the first claim of error, Mr. Baez argued that the ALJ's determination that Mr. Baez's sleep disorder and migraine headaches were non-severe impairments is unsupported by substantial evidence.  ECF No. 12 at 3.  Mr. Baez cited to *Evans v. Heckler*, a Fourth Circuit opinion defining when a claimant's medical condition is considered as non-severe.  734 F.2d 1012, 1014 (4th Cir. 1984).  The court stated that "[A]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Id.* (citing *Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)) (quotations omitted).  Mr. Baez argued that the ALJ's opinion that his sleep disorder and migraines were not severe impairments is unsupported by substantial evidence because of the evidence set forth in Mr. Baez's medical records.

First, Mr. Baez pointed to Dr. Hanson's VA evaluation, which stated that daytime somnolence affects Mr. Baez's ability to work, and suggests that he should avoid dangerous activities because of excess sleepiness. ECF. No. 12 at 22. Mr. Baez noted that though his sleep improved with the use of the CPAP machine, there was no finding that it became normal, and thus the ALJ erred in disregarding it as a severe impairment. *Id.* Second, Mr. Baez argued that his "headaches are associated with photo/phonophia, dizziness, tinnitus, blurred vision, vertigo, loss of coordination, fatigue, and problems concentrating." *Id.* Mr. Baez asserted that the ALJ improperly concluded that the migraines were not a severe impairment because Mr. Baez only initially complained about the headaches after he was discharged and that they appeared to be controlled by medication. *Id.* at 22-23.

In contrast, the Commissioner cited to the regulations, pointing out that "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." ECF No. 14 at 20 (citing 20 C.F.R. § 404.1521(a)). The code further details "basic work activities" as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b)(1-6) (listing examples). The Commissioner argued that "there is no evidence to demonstrate that [Mr. Baez's] sleep apnea significantly limited his ability to perform basic work-related activities. ECF No. 14 at 20. First, the Commissioner noted that the CPAP machine improved Mr. Baez's sleep quality even though Mr. Baez reported poor compliance with the machine. *Id.* The Commissioner further argued that Mr. Baez "does not cite to clinical observations in the record suggesting that he experienced ongoing drowsiness that would significantly limit his ability to perform work-related activities." *Id.* Second, the Commissioner argued that the ALJ reasonably concluded that Mr. Baez's headaches were non-

severe because "despite alleging disability beginning in October 2011, [Mr. Baez] did not even seek treatmenet for headaches until February 2013." *Id.* at 21.  Further, the Commissioner pointed out that Mr. Baez was frequently described as being "alert," suggesting that his headaches did not affect his ability to function. *Id.* at 22.  In conclusion, the Commissioner argued that Mr. Baez did not meet his burden of proving that his sleep apnea and headaches were severe impairments. *Id.* at 21, 23.

A severe impairment is defined as one that "significantly limits an individual's physical or mental abilities to do basic work activities." Policy Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe, Social Security Ruling 96-3p, 1996 WL 374181, at *1 (S.S.A. July 2, 1996). As mentioned by the Commissioner, "[a]n impairment is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521.  If the claimant has no severe impairment(s), the disability evaluation process ends. *Id.* § 404.1520(c).  If the claimant is found to have a severe impairment, the process continues on to the next steps. 20 C.F.R. § 404.1520(d)-(f).

Mr. Baez has an overall combined service-connected disability rating of 100 percent. R. 1055.  Though Mr. Baez received a 50 percent service-connected disability rating for his sleep apnea disorder, R. 1054, there is no evidence in the record that this disorder affects his ability to do basic work activities.  The 50 percent rating was based solely on the fact that Mr. Baez "[r]equires [the] use of a breathing assistance device such as a continuous airway pressure machine." R. 1064. Mr. Baez's claim for sleep apnea stems from a study conducted prior to his onset date in November of 2010, where he was found to have "good sleep effiency at 95%," and

thus only diagnosed with mild sleep apnea. R. 956-59. He continued to report sleep issues throughout 2011 and again had another sleep study done in December of 2011, which only revealed that he had a diagnosis of "snoring." R. 787. Further, there is evidence that Mr. Baez's mild sleep apnea was correlated with certain non-disability-related factors such as obesity, poor eating habits, and substantial amounts of caffeine. R. 787, 831, 969. At an appointment in October of 2013, Mr. Baez indicated that he stopped using the device for several months but then resumed using it again in September of 2013. R. 443. He stated he feels better in the morning but is still more drowsy than he would like to be. *Id.* A titration study in November of 2012 indicated that Mr. Baez demonstrated improvements with the use of a CPAP machine. R. 700.

Thus, it appears that Mr. Baez's sleep apnea, which is very mild, is easily controlled and improved with the use of the CPAP device. The record also indicates that Mr. Baez did not fully comply with the use of the machine, yet still complained of problems. The ALJ properly included this factor in his analysis of the severity of Mr. Baez's sleep apnea. *See Dunn v. Colvin*, 607 F. App'x 264, 276 (4th Cir. 2015) (stating that non-compliance with treatment is a factor for the ALJ to consider when assessing severity: "Appellant's non-compliance was merely one of a number of factors the ALJ considered in determining that Appellant's testimony about her symptoms was only partially credible."). Mr. Baez did not present any evidence on the record that his sleep apnea prohibited him from performing basic work activities. *See Clark v. Comm'r of Soc. Sec.*, No. 2:09-CV-417, 2010 WL 2730622, at *12 (E.D. Va. June 3, 2010) *report and recommendation adopted*, No. 2:09-CV-417, 2010 WL 2731380 (E.D. Va. July 9, 2010) (holding the ALJ's decision to disregard any finding of severity with the claimant's sleep apnea because she did "not present evidence indicating how sleep apnea . . . limited her ability to

perform work related activities, and she failed to show that either her sleep apnea or her hypertension restricted her ability to work for at least twelve months, as required by the Social Security Regulations"). Since Mr. Baez did not present evidence that his sleep apnea affected him in terms of performing basic work activities, the ALJ properly concluded that Mr. Baez's sleep apnea impairment did not interfere with his ability to work and would not prevent him from performing sedentary work. The Court therefore finds that substantial evidence supports the ALJ's finding that Mr. Baez's mild sleep apnea was not a severe impairment.

As for his migraines, despite the fact that Mr. Baez received a 30 percent service-connected disability rating, R. 1063, the ALJ's finding that Mr. Baez's migraines were not a severe impairment was based on substantial evidence. The VA rating was assigned based on the fact that Mr. Baez had "[c]haracteristic prostrating attacks occurring on an average once a month over last several months." *Id.* In late February at the NMCP Neurology Center, Mr. Baez indicated that his headaches began with blurred vision and weakness for about twenty minutes and were subsequently exacerbated by "[s]tress, prolonged exposure to cold weather, bright lights, bright sunlight and computer screens." R. 639. Dr. Keeling prescribed Mr. Baez three different medications to help with the headache pain prevention and control, but also noted that Mr. Baez generally relieves his headaches with sleep. *Id.* He again returned to the NMCP in April with no change in his condition. R. 536-37. In May, Mr. Baez reported to Dr. Keeling that the medication was not helping and he was having trouble sleeping. R. 508. Then in July he reported no change in the frequency or intensity of his headaches. R. 537. However in November, Mr. Baez reported that "the medication helps his headache." R. 431. He stated that the frequency and intensity of his headaches increased over the last month. R. 489. Thus,

though he appears to have followed up with his doctor fairly regularly throughout 2013, it does appear that medication eventually stabilized his discomfort.

Further, there is no evidence that his headaches affect his ability to do basic work activities, and it is noted that that he did not receive a higher percent disability rating because his attacks were not frequent enough or "productive of severe economic inadaptability." R. 1063; *see Pierce v. Principi*, 18 Vet. App. 440, 445 (2004), *as amended* (Feb. 8, 2005) ("As to the term "productive of economic inadaptability," the Secretary's counsel conceded at oral argument that "productive of" could be read as having either the meaning of "producing" or "capable of producing."). Though not defined by the regulations, Mr. Baez's headaches were not found to cause an inability to work (*ie.* economic inadaptability), which is generally determined by a disability rating above 50 percent. *See Pierce*, 18 Vet. App. at 446 (explaining that "[i]f 'economic inadaptability' were read to import unemployability, the appellant, if he met the economic-inadaptability criterion, would then be eligible for a rating of total disability based on individual unemployability resulting from a service-connected disability rather than just a 50% rating"). Thus, the mere definition of a 30 percent service-connected disability for his migraines does not render him unemployable.

Second, Mr. Baez did not seek treatment for his headaches until February 6, 2013, years after his alleged disability onset date. Though he complained of having headaches for over a year with increasing sensitivity to light, he told Dr. Treadwell that he did not mention the migraines before because "he wanted to deal with it himself." R. 642. "[I]f all that the claimant needs is conservative treatment, it is reasonable for an ALJ to find that the alleged disability is not as bad as the claimant says that it is." *Dunn v. Colvin*, 607 F. App'x 264, 274 (4th Cir. 2015).

In this case, the ALJ concluded that based on the lack of significant treatment during his alleged disability period and the fact that Mr. Baez reported that his headaches were subsequently controlled with medicine in the fall of 2013, little weight was attributable to Mr. Baez's claims of severity regarding his headaches. R. 14. Substantial evidence in the record, therefore, supports the ALJ's finding that Mr. Baez's sleep apnea and migraines were not severe because they did not significantly limit his ability to perform basic work activities.

Even assuming the sleep apnea and headaches were incorrectly labeled as non-severe, such an error ultimately would be harmless. Mr. Baez's other conditions, namely bilateral ankle tendonitis, bilateral shoulder disorder, traumatic brain injury, mood disorder, anxiety and PTSD, were all deemed to be severe by the ALJ. R. 13. The evaluation process proceeded past step two based on these severe impairments. R. 16. Therefore, the designations of sleep apnea and migraines as non-severe did not halt the evaluation process at step two. Once a claimant moves beyond step two, the ALJ is required to consider the combined effects of all of the claimant's impairments, severe and non-severe, throughout the remaining steps of the evaluation process. 20 C.F.R. § 404.1523. This Court has previously held an ALJ's failure to label an impairment as severe at step two to be harmless error as long as the ALJ discussed the evidence related to the impairment at subsequent steps in the evaluation process. *Cook ex rel. v. Colvin*, No. 2:11-cv-362, 2013 WL 1288156 (E.D. Va. Mar. 1, 2013). The ALJ in this case satisfied this requirement by referring to Mr. Baez's sleep apnea and headaches in the subsequent analysis following step two. Therefore, even if the ALJ committed error, his subsequent analysis of Mr. Baez's sleep apnea and headaches rendered such error harmless.

37

In sum, the ALJ's designations of Mr. Baez's sleep apnea and migraines as non-severe is supported by substantial evidence in the record, and further, the record lacks evidence of any significant functional limitations associated with these impairments. Therefore, the Court would affirm the decision of the Acting Commissioner on this claim.

**B. The ALJ erred by failing to either inquire of the VE or provide an explanation as to how Mr. Baez's moderate limitation in concentration, persistence, and pace would not affect his ability to stay on task.**

In the second claim of error, Mr. Baez argued that the ALJ's finding concerning Mr. Baez's residual functional capacity failed to account for the effect of his combination of impairments, including those he did not consider to be severe. ECF No. 12 at 3. Failure to account for the effect of his combination of impairments would violate the federal regulations:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, *we will consider the combined effect of all of your impairments* without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523 (emphasis added). Specifically, Mr. Baez argued that the ALJ improperly considered Mr. Baez's severe impairments that did not meet the criteria of any listing. ECF No. 12 at 24. He argued, "the ALJ found that Mr. Baez's impairments did not meet the criteria of any listing he considered, but did find that Mr. Baez had moderate limitations in social functioning and moderate limitations in concentration, persistence, and pace." *Id.* Mr. Baez then

38

noted that the ALJ wrongly considered whether Mr. Baez could perform sedentary work which included "limitations in social functioning; and simple, routine, repetitive tasks, due to limitations in concentration, persistence, or pace." *Id.* He argued that this consideration contradicts Fourth Circuit law, stating, an ALJ cannot "account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work. . . . The ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* at 25 (citing *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015)).

In *Mascio*, the Fourth Circuit found that the ALJ erred "by ignoring (without explanation) Mascio's moderate limitation in her ability to maintain her concentration, persistence, or pace." *Mascio*, 780 F.3d at 633. More specifically, the ALJ did not include Mascio's concentration, persistence, or pace limitation in his hypothetical to the VE. *Id.* at 634. The court stated that for the ALJ to have corrected his error, he would have had to explain why Mascio's limitation in concentration, persistence, or pace does not translate into a limitation in Mascio's residual functional capacity. *Id.* at 638 (providing a sufficient example, such as stating that these mental limitations were not necessary to be considered because they do not affect her ability to work).

In the first hypothetical to the VE in Mr. Baez's case, the ALJ asked:

ALJ: I'd like for you to assume a person of the same age, education, and work background as Mr. Baez. I'd like you to assume that that individual could perform sedentary work provided the work did not require more than occasional postural activities; would not require the individual to push, pull or perform frequent or constant reaching; would be limited to having only occasional contact with coworkers, supervisors and/or the general public, performing only simple repetitive, and routine tasks. Would that profile support any of Mr. Baez's past work?
VE: The security monitor, it would, yes.

R. 67.[2] The above indicates that the ALJ only considered whether Mr. Baez had the ability to perform simple tasks, and not whether his limitations affected his ability *to stay on task*, which is important because "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Mascio*, 780 F.3d at 637. Therefore, because "[t]he Fourth Circuit clearly emphasized the need for determining not just the ability to do simple tasks, but the ability to stay on that task for an entire workday," *Wedwick v. Colvin*, No. 2:14CV267, 2015 WL 4744389, at *23 (E.D. Va. Aug. 7, 2015) (citing *Mascio*, 780 F.3d at 637, 658)), the ALJ here should have inquired as so.

However, as noted by the Fourth Circuit in *Mascio*, remand is not appropriate unless the ALJ did not provide an explanation as to why such inquiry was not included.

> Perhaps the ALJ can explain why Mascio's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert.

*Mascio*, 780 F.3d at 638. This Court is thus tasked with determining whether the ALJ gave any explanation as to why he excluded Mr. Baez's moderate mental limitations when questioning the VE, or why he limited his inquiry to whether Mr. Baez's limitations affected his ability to perform routine tasks. The Commissioner argues that the ALJ did provide a sufficient explanation, citing to a paragraph where the ALJ discussed Mr. Baez's ability to perform sedentary work with his residual functional capacity. ECF No. 14 at 24. In this paragraph, the

---

[2] Further, the VE did reconsider his answer taking into account Mr. Baez's potential depreciating concentration ability. When Mr. Baez's attorney questioned the VE, he inquired into the VE's assessment of jobs in the economy if taking into account Mr. Baez's depreciation in his ability to concentrate:

> ATTORNEY: So, if a person has any depreciation as far as with their ability to concentrate, that can significantly impact their ability to perform [the surveillance system monitor] job?
> VE: It would. Yes, it would.

R. 69.

ALJ considered Mr. Baez's GAF scores and their effect on his longitudinal functioning. R. 20-21. He concluded by stating:

> These mental status examinations, coupled with the claimant's activities (including limited duty work activity until September 2013, going to church, driving, and shopping on a limited basis) suggest that the claimant can, in fact, *sustain simple work tasks* in an environment with limited contact with others. Consequently, the undersigned gives little weight to the claimant's GAF scores of 50."

R. 21 (emphasis added). While it is correct that the ALJ did use the term, "sustain simple work tasks," he stated this in regards to assessing the effect of Mr. Baez's GAF scores and not at all on whether Mr. Baez's concentration, persistence, and pace affect his ability to work.[3]

Further the Commissioner discussed how the ALJ's limited inquiry was consistent with the assessments of the state agency psychologists. ECF No. 14 at 24. However, the undersigned finds, as did the court in *Mascio*, "the ALJ's analysis does not go as far as the Commissioner's does." *See Mascio*, 780 F.3d at 638. The ALJ's conclusion that Mr. Baez could "sustain simple work tasks" because of his ability to perform limited duty and go to church still does not explain how Mr. Baez's moderate limitations in concentration, persistence, and pace affect his ability to stay on task for an entire work day. Therefore, remand is necessary for the ALJ to provide such an explanation. *See id.* ("But because the ALJ here gave no explanation, a remand is in order."); *Wedwick*, 2015 WL 4744389, at *24 (remanding because the ALJ did not properly question the VE regarding the claimant's ability to stay on task due to limitations in concentration, persistence, and pace); *Scruggs v. Colvin*, No. 3:14-CV-00466-MOC, 2015 WL 2250890, at *6 (W.D.N.C. May 13, 2015) ("The court finds that the facts here squarely align with *Mascio,* and

---

[3] It should be noted that the ALJ's opinion was decided on September 4, 2014, R. 25, and *Mascio* was decided on March 18, 2015, *Mascio*, 780 F.3d at 632.

as such, believes that remand is appropriate so that the ALJ may properly account for plaintiff's limitations in concentration, persistence, or pace."); *Morton-Thompson v. Colvin*, No. 3:14CV179 REP, 2015 WL 5561210, at *7 (E.D. Va. Aug. 19, 2015) *report and recommendation adopted sub nom. Thompson v. Colvin*, No. 3:14CV179, 2015 WL 5561211 (E.D. Va. Sept. 14, 2015) (remanding because "the ALJ failed to discuss Plaintiff's ability to perform those relevant functions for a full workday.").

**C. Because the ALJ did not explain how Mr. Baez's limitations in concentration, persistence, and pace affected his ability to stay on task, or by properly questioning the VE as to this issue, the Court cannot make a finding as to the third claim.**

As mentioned in Section III, *supra*, at step five of the sequential analysis, the ALJ must determine whether any impairment prevents the claimant from having substantial gainful employment. To make this finding, the ALJ can pose hypotheticals to the VE; however, the ALJ must "pose hypothetical questions that *accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments*, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Parker v. Colvin*, No. 3:14CV502, 2015 WL 5793695, at *22 (E.D. Va. Sept. 29, 2015) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989)) (emphasis added). In the third claim of error, Mr. Baez argued that the ALJ relied on vocational testimony in reaching his decision that failed to fairly account for all of Mr. Baez's limitations resulting from his impairment.

The ALJ did not question the VE regarding Mr. Baez's ability to stay on task despite his moderate limitations in concentration, persistence or pace. Whether this is error depends on whether the ALJ had an explanation for why such moderate limitations would not affect his

42

ability to stay on task. *See Mascio*, 780 F.3d at 638 ("Perhaps the ALJ can explain why [the claimant's] moderate limitation in concentration, persistence or pace at step three does not translate into a limitation in [the claimant's] residual functional capacity."). As the Court found in Section V.B, *supra*, the ALJ provided no such explanation. Consequently, the Court cannot determine whether failing to question the VE on this subject was error, and remand is necessary to give the ALJ the opportunity to question the VE regarding this issue or otherwise explain why such limitation does not affect Mr. Baez's residual functional capacity. Therefore the Court will not address Mr. Baez's third claim at this time. *See Scrugg*, 2015 WL 2250890, at *7 ("Finding that remand is appropriate partially based on the colloquy between the ALJ and VE at the hearing, the court will not address Plaintiff's additional assignment of error.").

## VI. RECOMMENDATION

For these reasons, the undersigned **RECOMMENDS** the Defendant's Motion for Summary Judgment be **DENIED**, Baez's Motion for Summary Judgment be **GRANTED** to the extent it seeks reversal and remand of the Commissioner's decision, and **DENIED** to the extent that it seeks entry of an order directing the award of benefits, and the Commissioner's decision be **VACATED** and **REMANDED.**

## VII. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of the Court specific written objections to the above findings and recommendations within fourteen days from the date

this Report and Recommendation is forwarded to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), computed pursuant to Federal Rule of Civil Procedure Rule 6(a) plus three days permitted by Federal Rule of Civil Procedure Rule 6(d). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

2. A United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to the counsel of record for the Plaintiff and the Defendant.

LAWRENCE R. LEONARD
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 7, 2015

44